MARTIN A. MUCKLEROY
**MUCKLEROY LUNT, LLC**
Nevada Bar No.: 009634
6077 S. Fort Apache Rd., Ste. 140
Las Vegas, NV 89148
Tel: (702) 907-0097
Fax: (702) 938-4065
martin@muckleroylunt.com

ROBERT C. SCHUBERT (rschubert@sjk.law) (*pro hac vice* forthcoming)
WILLEM F. JONCKHEER (wjonckheer@sjk.law) (*pro hac vice* forthcoming)
AMBER L. SCHUBERT (aschubert@sjk.law) (*pro hac vice* forthcoming)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| EDWARD CHERVENY, AMANDA COLFLESH, CAREY HYLTON, CYNTHIA RUBNER, and WILLIAM RUBNER,<br><br>    Plaintiffs,<br><br>v.<br><br>CAESARS ENTERTAINMENT, INC.,<br><br>    Defendant. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Upon personal knowledge as to their own acts, and based upon their investigation, their counsel's investigation, and information and belief as to all other matters, Plaintiffs, on behalf of themselves and all others similarly situated, allege:

**INTRODUCTION**

1. On September 14, 2023, Caesars Entertainment, Inc. announced that hackers had stolen a copy of its "Caesars Rewards" loyalty program database, containing the Personally Identifiable Information ("PII") of a "significant number" of members, including their Social Security numbers and driver's license numbers, among other sensitive data (the "Data Breach").[1]

2. According to public filings, the hackers infiltrated Caesars' networks on August 18, 2023 and began exfiltrating data approximately five days later. Caesars discovered the breach on or around September 7, 2023.[2]

3. Caesars disclosed that over 40,000 residents in the state of Maine alone had their data stolen in the Data Breach,[3] suggesting it likely affected millions of people across the country.

4. Caesars claims it is the largest gaming company in the United States.[4] Caesars also runs the largest casino loyalty program in the United States, known as "Caesars Rewards," serving over 60 million members.[5]

5. Caesars Rewards members, including Plaintiffs, shared their sensitive PII with Caesars expecting that Caesars would store it safely and not expose it to unauthorized parties.

6. Caesars provides special benefits to Caesars Rewards members, enticing them to spend money on Caesars' goods and services with escalating "Tiers" of loyalty membership.[6]

7. The Data Breach was a direct result of Caesars' failure to implement reasonable cyber-security procedures to protect its members' PII.

---

[1] https://response.idx.us/Caesars/#learn-more.
[2] https://apps.web.maine.gov/online/aeviewer/ME/40/b21dc5d1-0bee-4a4c-92dc-bef4bbb519c9.shtml.
[3] *Id.*
[4] https://www.caesars.com/corporate.
[5] https://www.vegashowto.com/caesars-rewards.
[6] https://www.caesars.com/myrewards/benefits-overview.

8.     Plaintiffs, individually and on behalf of all others similarly situated, allege claims under the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200), the California Consumer Privacy Act (Cal. Civ. Code § 1798.100, *et seq*.), the California Consumer Records Act (Cal. Civ. Code § 1798.80, *et seq*.), the California Consumers Legal Remedies Act (Cal. Civ. Code § 1750, *et seq*.), the Illinois Personal Information Protection Act (815 Ill. Comp. Stat. § 530/1, *et seq*.), the Illinois Consumer Fraud Act (815 Ill. Comp. Stat. § 505, *et seq*.), the Illinois Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. § 510/1, *et seq*.), the Louisiana Unfair Trade Practices and Consumer Protection Law (La. Rev. Stat. Ann. § 51:1401, *et seq*.), the Minnesota Consumer Fraud Act (Minn. Stat. § 325F.68, *et seq*. and Minn. Stat. § 8.31, *et seq*.), the Minnesota Uniform Deceptive Trade Practices Act (Minn. Stat. § 325D.43, *et seq*.), the Nevada Consumer Fraud Act (Nev. Rev. Stat. § 41.600), and for negligence, negligent misrepresentation, and unjust enrichment. Plaintiffs, individually and on behalf of all others similarly situated, ask the Court to compel Caesars to adopt reasonable information security practices to secure the sensitive PII that Caesars collects and stores in its databases and to grant such other relief as the Court deems just and proper.

## PARTIES

*Plaintiffs*

9.     Plaintiff Edward Cherveny, a resident and citizen of Illinois, has been a Caesars Rewards member since in or around March 2023.

10.     Plaintiff Amanda Colflesh, a resident and citizen of Louisiana, has been a Caesars Rewards member since in or before 2012.

11.     Plaintiff Carey Hylton, a resident and citizen of California, has been a Caesars Rewards member for at least ten years.

12.     Plaintiff Cynthia Rubner, a resident and citizen of Minnesota, has been a Caesars Rewards member since in or around 2010.

13.     Plaintiff William Rubner, a resident and citizen of Minnesota, has been a Caesars Rewards member since in or around 2017.

*Defendant*

14.     Defendant Caesars Entertainment, Inc. is a Delaware corporation headquartered at 100 West Liberty Street, 12th Floor, Reno, Nevada. Caesars is a global gaming and hospitality company that owns, leases, brands, or manages 53 domestic properties across 18 states with approximately 52,700 slot machines and 47,200 hotel rooms. Caesars also operates and conducts sports betting across 30 jurisdictions in North America. Caesars' properties and services include Caesars Palace, Caesars Sportsbook, Caesars Racebook, Harrah's hotel, Paris Las Vegas, Planet Hollywood, Flamingo Las Vegas, and The Linq.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The putative class contains millions of members, many of whom have citizenship diverse from Caesars.

16.     This Court has jurisdiction over Caesars because its principal place of business is in the District of Nevada, it operates in this District, and the computer systems implicated in the Caesars Data Breach are likely based in this District. Through its business operations in this District, Caesars intentionally avails itself of the markets within this District such that the exercise of jurisdiction by this Court is just and proper.

17.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Caesars resides in Nevada. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District. Caesars is based in this District, maintains customer PII in the District, and has caused harm to Plaintiffs and Class Members residing in this District.

## SUBSTANTIVE ALLEGATIONS

### I.     The Data Breach

18.     On August 18, 2023, hackers gained access to Caesars' loyalty program database by "social engineering" a third-party IT contractor:

Caesars was the victim of a social engineering attack on an outsourced IT support vendor that resulted in unauthorized access (on August 18, 2023) to Caesars' network and the exfiltration of data (beginning on or about August 23, 2023), which Caesars subsequently confirmed (on September 7, 2023) included the personal information of state residents.[7]

19.     On September 14, 2023, Caesars disclosed the Data Breach in a Form 8-K filed with the SEC, explaining: "[Caesars] identified suspicious activity in its information technology network resulting from a social engineering attack on an outsourced IT support vendor used by the Company."[8] The disclosure continued:

As a result of our investigation, on September 7, 2023, we determined that the unauthorized actor acquired a copy of, among other data, our loyalty program database, which includes driver's license numbers and/or social security numbers for a significant number of members in the database. We are still investigating the extent of any additional personal or otherwise sensitive information contained in the files acquired by the unauthorized actor.

20.     Caesars conveyed substantially the same information on a website hosted by the data breach response firm IDX.[9]

21.     Plaintiffs herein received Data Breach notices via emails from Caesars dated between October 11 and October 16, 2023. Each of the notices conveys substantially the same information as described above.

22.     According to reports, the Data Breach was perpetrated by a criminal hacking group known as "Scattered Spider"[10] and involved a member of the group allegedly posing as an employee to obtain a password change from the company's IT help desk.[11] *The Wall Street Journal* further reported that Caesars paid "roughly half" of a $30 million ransom demand in an

---

[7] https://apps.web.maine.gov/online/aeviewer/ME/40/b21dc5d1-0bee-4a4c-92dc-bef4bbb519c9.shtml.

[8] https://www.sec.gov/Archives/edgar/data/1590895/000119312523235015/d537840d8k.htm.

[9] https://response.idx.us/caesars/.

[10] https://www.bleepingcomputer.com/news/security/caesars-entertainment-confirms-ransom-payment-customer-data-theft/.

[11] https://www.wsj.com/business/hospitality/caesars-paid-ransom-after-suffering-cyberattack-7792c7f0.

attempt to secure its customers' data.[12] However, in its September 14 disclosure, Caesars pointedly cautioned that it "cannot guarantee" that the perpetrators will delete the stolen data.

23.    The scope of the Data Breach is likely massive. On October 6, 2023, Caesars disclosed to the Maine Attorney General that, within Maine alone, 41,397 residents were impacted by the Data Breach (with overall numbers still "TBD" at that time).[13]

## II.    Caesars' Privacy Representations

24.    Caesars acknowledges its legal and contractual obligations to protect its clients' sensitive PII. According to the Company's U.S. Privacy Policy, Caesars claims it is "committed to respecting your data privacy" and that "[w]e maintain physical, electronic and organizational safeguards that reasonably and appropriately protect against the loss, misuse and alteration of the information under our control."[14]

25.    Caesars further acknowledges that it uses its customers' data in part for its own profit-generating purposes, including to "promote our business," to conduct "internal market research," and even to enable third-parties to send "marketing and promotional offers."

## III.    Caesars Failed to Comply with Reasonable Cybersecurity Standards

26.    Hospitality companies like Caesars are attractive targets for financially-motivated hackers like the ones who allegedly perpetrated the Data Breach. According to Trustwave's 2020 Global Security Report, the "hospitality" sector had the third largest number of security compromises and data breaches, following only the "retail" and "finance and insurance" industries.[15] Indeed, according to Open Data Security: "The hospitality industry is a common target for cyber criminals because of the massive amount of data hotels hold."[16] Furthermore,

---

[12] *Id*.

[13] https://apps.web.maine.gov/online/aeviewer/ME/40/b21dc5d1-0bee-4a4c-92dc-bef4bbb519c9.shtml.

[14] https://www.caesars.com/corporate/privacy.

[15] *2020 Trustwave Global Security Report*, https://21158977.fs1.hubspotusercontent-na1.net/hubfs/21158977/Web/Library/Documents%20pdf/D_16791_2020-trustwave-global-security-report.pdf.

[16] Open Data Security, *Cybersecurity in the Hotel Industry: Lessons from Marriott Data Breach*, https://opendatasecurity.co.uk/cybersecurity-in-the-hotel-industry-lessons-from-marriott-data-breach/.

cybercriminals have recently targeted prominent gaming companies just like Caesars, most notably in a 2019 incident in which hackers stole the PII of millions of MGM Resorts customers.

27. At all times relevant to this Complaint, Caesars knew or should have known the significance and necessity of safeguarding its customers' PII and the foreseeable consequences of a data breach. Caesars knew or should have known that because it collected and maintained the PII for a significant number of customers, a significant number of customers would be harmed by a breach of its systems.

28. Because PII is so sensitive and cyberattacks have become a rising threat, the FTC has issued numerous guides for businesses holding sensitive PII and emphasized the importance of adequate data security practices. The FTC also stresses that appropriately safeguarding PII held by businesses should be factored into all business-related decision making.

29. The FTC has also issued guidance for addressing the devastating results of data breaches and the harmful effects of an unauthorized person gaining access to PII, warning: "Once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."

30. An FTC Publication titled "Protecting Personal Information: A Guide for Business" lays out fundamental data security principles and standard practices that businesses should implement to protect PII.[17] The guidelines highlight that businesses should (a) protect the personal customer information they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems.

---

[17] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

31.     The FTC also recommends businesses use an intrusion detection system, monitor all incoming traffic to the networks for unusual activity, monitor for large amounts of data being transmitted from their systems, and have a response plan prepared in the event of a breach.

32.     The FTC also recommends that businesses limit access to sensitive PII, require complex passwords to be used on the networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures—a step that would have been particularly prudent in light of the methods used by the perpetrators in this case.

33.     Businesses that do not comply with the basic protection of sensitive PII are facing enforcement actions brought by the FTC. Failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data is an unfair act or practice prohibited pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

34.     Many states' unfair and deceptive trade practices statutes are similar to the FTC Act, and many states adopt the FTC's interpretations of what constitutes an unfair or deceptive trade practice.

35.     Caesars knew or should have known of its obligation to implement appropriate measures to protect its customers' PII but failed to comply with the FTC's basic guidelines and other industry best practices, including the minimum standards set by the National Institute of Standards and Technology Cybersecurity Framework Version 1.1.[18]

36.     Caesars' failure to employ reasonable measures to adequately safeguard against unauthorized access to PII constitutes an unfair act or practice as prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, as well as by state statutory analogs.

37.     Caesars failed to use reasonable care in maintaining the privacy and security of Plaintiffs' and Class Members' PII. If Caesars had implemented adequate security measures, cybercriminals could never have accessed the PII of Plaintiffs and Class Members, and the Data Breach would have either been prevented in its entirety or much smaller in scope.

---

[18] https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

38.     Due to the sensitive nature of the PII accessed in the Data Breach—including driver's license and Social Security numbers—cybercriminals can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and indefinitely in the future. As a result, Plaintiffs and Class Members have suffered injury and face an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

39.     The Data Breach exposed PII that is both valuable and highly coveted on underground markets because it can be used to commit identity theft and financial fraud. Identity thieves use such PII to, among other things, gain access to bank accounts, social media accounts, and credit cards.  Identity thieves can also use this PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government identification cards, or create "synthetic identities." Additionally, identity thieves often wait significant amounts of time—months or even years—to use the PII obtained in data breaches because victims often become less vigilant in monitoring their accounts as time passes, therefore making the PII easier to use without detection. These identity thieves will also re-use stolen PII, resulting in victims of one data breach suffering the effects of several cybercrimes from one instance of unauthorized access to their PII.

40.     Victims of data breaches are much more likely to become victims of identity fraud than those who have not. Data Breach victims who do experience identity theft often spend hundreds of hours fixing the damage caused by identity thieves.[19] Additionally, the U.S. Department of Justice's Bureau of Justice Statistics has reported that, even if data thieves have not caused financial harm, data breach victims "reported spending an average of about 7 hours clearing up the issues."[20]

41.     Social Security numbers are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult to change. The

---

[19] https://www.marylandattorneygeneral.gov/ID%20Theft%20Documents/Identitytheft.pdf.
[20] https://bjs.ojp.gov/content/pub/pdf/vit14.pdf.

Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

> Identity theft is one of the fastest growing crimes in America. A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought.
>
> Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[21]

42. The information compromised in the Data Breach—including driver's license and Social Security numbers—is much more valuable than the loss of credit card information in a retailer data breach. There, victims can simply close their credit and debit card accounts and potentially even rely on automatic fraud protection offered by their banks. Here, however, the information compromised is much more difficult, if not impossible, for consumers to re-secure after being stolen.

43. Caesars is offering impacted members two years of free identity protection services, but the protection Caesars is offering is inadequate. As discussed above, identity thieves often hold on to personal information for years after a data breach to commit fraud after such free programs expire. Moreover, Caesars' offer fails to actually prevent identity theft. At best, it serves as an after-the-fact notification that consumers' PII is being used maliciously. Plaintiffs and Class Members maintain an interest in ensuring that their PII is secure, remains secure, and is not subject to further misappropriation and theft.

## IV. Plaintiffs' Experiences

44. To become members of Caesars Rewards, Plaintiffs each provided their sensitive PII to Caesars including, among other things, their names, driver's license numbers, and Social Security numbers.

---

[21] https://www.ssa.gov/pubs/EN-05-10064.pdf.

9

45.     Plaintiffs have taken reasonable steps to maintain the confidentiality of their PII. In becoming members of Caesars Rewards and entrusting their PII to Caesars, Plaintiffs relied on Caesars' representations, experience, and sophistication to keep their information secure and confidential.

46.     As a result of the Data Breach, Plaintiffs were each forced to take measures to mitigate the harm, including spending time monitoring their credit and financial accounts, researching the Data Breach, and researching and taking steps to prevent and mitigate the likelihood of identity theft, among other harms.

47.     **Plaintiff Cherveny** has been a Caesars Rewards member since in or around March 2023. Plaintiff Cherveny has stayed at Caesars and used Caesars' services approximately weekly since becoming a Caesars Rewards member. On or around October 16, 2023, Caesars notified Plaintiff Cherveny that he was a victim of the Data Breach.

48.     **Plaintiff Colflesh** has been a Caesars Rewards member since in or before 2012. From then until approximately early-2020, Plaintiff Colflesh stayed at Caesars and used Caesars' services up to multiple times per week. After learning about the Data Breach, Plaintiff Colflesh has taken steps to monitor and secure her identity, including monitoring her bank and credit accounts for suspicious activity.

49.     **Plaintiff Hylton** has been a Caesars Rewards member for at least ten years. Plaintiff Hylton has stayed at Caesars and used Caesars' services multiple times per year since becoming a Caesars Rewards member. On or around October 11, 2023, Caesars notified Plaintiff Hylton that she was a victim of the Data Breach.

50.     **Plaintiff Cynthia Rubner** has been a Caesars Rewards member since in or around 2010. Plaintiff Cynthia Rubner has stayed at Caesars and used Caesars' services at least once per year since becoming a Caesars Rewards member. On or around October 11, 2023, Caesars notified Plaintiff Cynthia Rubner that she was a victim of the Data Breach. After learning about the Data Breach, Plaintiff Cynthia Rubner has taken steps to monitor and secure her identity,

including contacting her bank and credit reporting agencies and monitoring her bank and credit accounts for suspicious activity.

51.     **Plaintiff William Rubner** has been a Caesars Rewards member since in or around 2017. Plaintiff William Rubner has stayed at Caesars and used Caesars' services at least once per year since becoming a Caesars Rewards member. In or around mid-October 2023, Caesars notified Plaintiff William Rubner that he was a victim of the Data Breach. After learning about the Data Breach, Plaintiff William Rubner has taken steps to monitor and secure his identity, including monitoring his bank and credit accounts for suspicious activity.

52.     As a result of the Data Breach, Plaintiffs and Class Members have suffered actual injuries including: (a) paying money to Caesars for goods and services, which Plaintiffs would not have done had Caesars disclosed that it lacked data security practices adequate to safeguard Plaintiffs' PII from theft; (b) damages to and diminution in the value of Plaintiffs' PII—property that Plaintiffs entrusted to Caesars as a condition of receiving its goods and services; (c) loss and invasion of Plaintiffs' privacy; and (d) injuries arising from the increased risk of fraud and identity theft, including the cost of taking reasonable identity theft protection measures, which will continue for years.

## CLASS ACTION ALLEGATIONS

53.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a **Nationwide** Class, defined as follows:

> All persons in the United States whose personal information was compromised in the Data Breach announced by Caesars Entertainment, Inc. in September 2023.

54.     Plaintiff Hylton seeks certification of a **California** Subclass, defined as follows:

> All California residents whose personal information was compromised in the Data Breach announced by Caesars Entertainment, Inc. in September 2023.

55.     Plaintiff Cherveny seeks certification of an **Illinois** Subclass, defined as follows:

> All Illinois residents whose personal information was compromised in the Data Breach announced by Caesars Entertainment, Inc. in September 2023.

56.     Plaintiff Colflesh seeks certification of a **Louisiana** Subclass, defined as follows:

All Louisiana residents whose personal information was compromised in the Data Breach announced by Caesars Entertainment, Inc. in September 2023.

57.     Plaintiffs William and Cynthia Rubner seek certification of a **Minnesota** Subclass, defined as follows:

All Minnesota residents whose personal information was compromised in the Data Breach announced by Caesars Entertainment, Inc. in September 2023.

58.     Excluded from the Nationwide Class and Subclasses are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Nationwide Class and Subclasses are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

59.     This action is brought and may be properly maintained as a class action pursuant to Rule 23. This action satisfies the requirements of Rule 23, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

60.     **Numerosity.** The Nationwide Class and Subclasses are so numerous that the individual joinder of all members is impracticable. While the Nationwide Class and Subclasses' exact number are currently unknown and can only be ascertained through appropriate discovery, Plaintiffs, on information and belief, allege that the Nationwide Class and Subclasses include anywhere from several hundred thousand to several million members.

61.     **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Nationwide Class or Subclass Members. These common questions, which do not vary among Nationwide Class or Subclass Members and which may be determined without reference to any Nationwide Class or Subclass member's individual circumstances, include, but are not limited to:

a. Whether Defendant knew or should have known that its systems were vulnerable to unauthorized access;

b. Whether Defendant failed to take adequate and reasonable measures to ensure its data systems were protected;

c. Whether Defendant failed to take available steps to prevent and stop the breach from happening;

d. Whether Defendant owed a legal duty to Plaintiffs and Class Members to protect their PII;

e. Whether Defendant breached any duty to protect the personal information of Plaintiffs and Class Members by failing to exercise due care in protecting their PII;

f. Whether Plaintiffs and Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and,

g. Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief or restitution.

62.     **Typicality.** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way.

63.     **Adequacy of Representation.** Plaintiffs are adequate Nationwide Class and Subclass representatives because they are Nationwide Class and Subclass Members, and their interests do not conflict with the Nationwide Class or Subclasses' interests. Plaintiffs retained counsel who are competent and experienced in class action and data breach litigation. Plaintiffs and their counsel intend to prosecute this action vigorously for the Nationwide Class and Subclasses' benefit and will fairly and adequately protect their interests.

64.     **Predominance and Superiority.** The Nationwide Class and Subclasses can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Nationwide Class or Subclass Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Nationwide Class and Subclass member's claim is impracticable. Even if each Nationwide Class or Subclass member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceed.

Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

65.    **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Defendant has acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

<u>**CLAIMS FOR RELIEF**</u>

**Count 1**
**Violation of California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200**
**On behalf of Plaintiff Hylton and the California Subclass**

66.    Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

67.    Caesars and Plaintiff are "persons" as defined by the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17201.

68.    The UCL states that "unfair competition shall mean and include any [1] unlawful, unfair or fraudulent business act or practice and [2] unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

69.    By failing to take reasonable precautions to protect the PII of Plaintiff and the California Subclass, Caesars has engaged in "unlawful," "unfair," and "fraudulent" business practices in violation of the UCL.

70.     First, Caesars engaged in "unlawful" acts or practices because it violated multiple laws, including but not limited to the California Consumer Records Act, Cal. Civ. Code § 1798.81.5 (requiring reasonable data security measures); the FTC Act, 15 U.S.C. § 45; and the common law, all as alleged herein.

71.     Second, Caesars engaged in "unfair" acts or practices, including the following:

a.  Caesars failed to implement and maintain reasonable data security measures to protect the California Subclass Members' PII. Caesars failed to identify foreseeable security risks, remediate identified risks, and adequately improve its data security in light of the highly sensitive nature of the data which it maintained and the known risk of cyber intrusions in the hospitality industry. Caesars' conduct, with little if any social utility, is unfair when weighed against the harm to the California Subclass Members whose PII has been compromised.

b.  Caesars' failure to implement and maintain reasonable data security measures was also contrary to legislatively-declared public policy that seeks to protect consumers' personal information and ensure that entities entrusted with PII adopt appropriate security measures. These policies are reflected in various laws, including but not limited to the FTC Act, 15 U.S.C. § 45; and the California Consumer Records Act, Cal. Civ. Code § 1798.81.5 (requiring reasonable data security measures).

c.  Caesars' failure to implement and maintain reasonable data security measures also led to substantial consumer injuries described herein, which are not outweighed by countervailing benefits to consumers or to competition. Moreover, because consumers could not know of Caesars' inadequate data security, consumers could not have reasonably avoided the harms that Caesars' conduct caused.

72. Third, Caesars engaged in "fraudulent" acts or practices, including but not limited to the following:

    a. Caesars omitted and concealed the fact that it did not employ reasonable safeguards to protect consumers' PII. Caesars could and should have made a proper disclosure during the account creation process for Caesars Rewards members, or by any other means reasonably calculated to inform consumers of the inadequate data security. Caesars knew or should have known that its data security practices were deficient. This is true because, among other things, Caesars was aware that the hospitality industry was a frequent target of sophisticated cyberattacks. Caesars knew or should have known that its data security was insufficient to guard against those attacks.

    b. Caesars also made implied or implicit false representations that its data security practices were sufficient to protect consumers' PII. Caesars required consumers to provide their PII—including Social Security and driver's license numbers—during Caesars Rewards account creation process. In doing so, Caesars made implied or implicit representations that its data security practices were sufficient to protect consumers' PII. By virtue of accepting Plaintiff's and California Subclass Members' PII during the Caesars Rewards account creation process, Caesars implicitly represented that its data security procedures were sufficient to safeguard the PII. Those representations were false and misleading.

73. Plaintiff and California Subclass Members transacted with Caesars in California by, among other things, creating, using, and maintaining their Caesars Rewards accounts while in California. Plaintiff and California Subclass Members were deceived in California when they joined and used the Caesars Rewards program from California and were not informed of Caesars' deficient data security practices.

74.     As a direct and proximate result of Caesars' unfair, unlawful, and fraudulent acts and practices, Plaintiff and California Subclass Members were injured, lost money or property, and suffered the various types of damages alleged herein.

75.     The UCL states that an action may be brought by any person who has "suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. Plaintiff and California Subclass Members suffered injury in fact and lost money or property as a result of Caesars' unfair competition including the loss of value of their breached PII. PII is valuable, which is demonstrated not only by the fact that Caesars requires consumers to provide PII during the Caesars Rewards account creation process, but also because Caesars uses PII for its marketing and other purposes.

76.     Cal. Bus. & Prof. Code § 17203 states:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments […] as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

77.     Plaintiff and California Subclass Members are entitled to the injunctive relief requested herein to address Caesars' past and future acts of unfair competition.

78.     Plaintiff and California Subclass Members are entitled to restitution of money and property that was acquired by Caesars by means of its unfair competition and restitutionary disgorgement of all profits accruing to Caesars as a result of its unfair business practices.

79.     Plaintiff and California Subclass Members lack an adequate remedy at law because the injuries here include an imminent risk of identity theft and fraud that can never be fully remedied through damages.

80.     Further, if an injunction is not issued, Plaintiff and California Subclass Members will suffer irreparable injury. The risk of another such breach is real, immediate, and substantial. Plaintiff lacks an adequate remedy at law that will reasonably protect against the risk of such further breach.

81. Plaintiff and California Subclass Members seek all monetary and non-monetary relief allowed by the UCL, including reasonable attorneys' fees under Cal. Code of Civ. Procedure § 1021.5.

**Count 2**
**Violation of California Consumer Privacy Act**
**Cal. Civ. Code § 1798.100, *et seq.***
**On behalf of Plaintiff Hylton and the California Subclass**

82. Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

83. Cal. Civ. Code § 1798.150(a)(1) provides that:

> Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action.

84. Plaintiff and the members of the California Subclass are consumers as that term is defined in Cal. Civ. Code § 1798.140(i).

85. Caesars is a business as that term is defined in Cal. Civ. Code § 1798.140(d). Caesars is organized or operated for the profit or financial benefit of its owners. Caesars collects consumers' personal information (including Plaintiff and the members of the California Subclass) or such information is collected on Caesars' behalf, and Caesars determines the purposes and means of processing of consumers' personal information. Caesars does business in California and had annual revenue of billions of dollars in the preceding year.

86. The information compromised during the Data Breach constitutes "personal information" as that term is defined in Cal. Civ. Code § 1798.140(v)(1). At a minimum, that information included names, Social Security numbers, driver's license numbers, and dates of birth.

87. Under the CCPA, Caesars had a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information that it stored. Cal. Civ. Code § 1798.150(a)(1).

88. Plaintiff's and California Subclass Members' nonencrypted and nonredacted personal information, as defined in Cal. Civ. Code § 1798.81.5(d)(1), was exfiltrated in the Caesars Data Breach, including names and Social Security and driver's license numbers.

89. Caesars violated its duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining, and testing Caesars' information security controls to ensure that PII in its possession was adequately secured by, for example, encrypting sensitive personal information, installing intrusion detection systems and monitoring mechanisms, and using access controls to limit access to sensitive data.

90. Caesars knew or should have known that its computer systems and information security controls were inadequate to safeguard Plaintiff's and California Subclass Members' PII and that unauthorized access and exfiltration, theft, or disclosures, was highly likely as a result. Caesars' actions in engaging in the above-named unlawful practices and acts were negligent, knowing, willful, and/or wanton and reckless with respect to the rights of Plaintiff and California Subclass Members.

91. As a direct and proximate result of the foregoing, Plaintiff and the California Subclass Members have suffered injuries including but not limited to actual damages, and in being denied a statutory benefit conferred on them by the California legislature.

92. As a result of these violations, Plaintiff and the California Subclass Members are entitled to actual pecuniary damages, injunctive or declaratory relief, and any other relief that the Court deems proper. Plaintiff reserves the right to amend this Complaint to seek statutory damages under the CCPA on behalf of himself and the Subclass after providing Caesars with the written notice required by Cal. Civ. Code § 1798.150(b).

**Count 3**
**Violation of California Consumer Records Act**
**Cal. Civ. Code § 1798.80, *et seq*.**
**On behalf of Plaintiff Hylton and the California Subclass**

93. Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

94.     The California legislature enacted the California Customer Records Act ("CCRA") to "ensure that personal information about California residents is protected." Cal. Civ. Code § 1798.81.5.

95.     The CCRA states: "A business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access." Cal. Civ. Code § 1798.81.5(b).

96.     The CCRA defines owns, licenses, and maintains as follows: "[T]he terms 'own' and 'license' include personal information that a business retains as part of the business' internal customer account or for the purpose of using that information in transactions with the person to whom the information relates. The term 'maintain' includes personal information that a business maintains but does not own or license.'" Cal. Civ. Code § 1798.81.5(a)(2). Caesars owns, licenses, and/or maintains the PII that was involved in the Data Breach.

97.     The CCRA defines personal information, in pertinent part, as follows:

"Personal information" means either of the following: (A) An individual's first name or first initial and the individual's last name, in combination with any one or more of the following data elements, when either the name or the data elements are not encrypted or redacted: (i) Social security number. (ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual….

Cal. Civ. Code § 1798.81.5(d)(1). The PII stolen in the Data Breach includes personal information that meets this definition. The PII was unencrypted, as evidenced by the fact that Caesars was required to provide notification letters under the laws of several states that require notification of unauthorized access to unencrypted and unredacted information.

98.     Caesars failed to maintain reasonable data security procedures appropriate to the PII. Accordingly, Caesars violated Cal. Civ. Code § 1798.81.5(b).

99.     Plaintiff and California Subclass Members were injured by Caesars' violation of Cal. Civ. Code § 1798.81.5(b) and seek damages pursuant to Cal. Civ. Code § 1798.84(b). They

seek all monetary and non-monetary relief allowed by the CCRA to compensate for their various types of damages alleged herein.

100. Plaintiff and the California Subclass Members have suffered injuries including but not limited to actual damages, and in being denied a statutory benefit conferred on them by the California legislature.

**Count 4**
**Violation of California Consumers Legal Remedies Act**
**Cal. Civ. Code § 1750, *et seq*.**
**On behalf of Plaintiff Hylton and the California Subclass**

101. Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

102. The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. ("CLRA") is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

103. Caesars is a "person" as defined by Civil Code §§ 1761(c) and 1770, and has provided "services" as defined by Civil Code §§ 1761(b) and 1770.

104. Plaintiff and the California Subclass are "consumers" as defined by Civil Code §§ 1761(d) and 1770, and have engaged in a "transaction" as defined by Civil Code §§ 1761(e) and 1770.

105. Caesars' acts and practices were intended to and did result in the sales of products and services to Plaintiff and the California Subclass Members in violation of Civil Code § 1770, including:

    a. Representing that goods or services have characteristics that they do not have;

    b. Representing that goods or services are of a particular standard, quality, or grade when they were not;

    c. Advertising goods or services with intent not to sell them as advertised; and

    d. Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

106. Caesars' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Caesars' data security and ability to protect the confidentiality of consumers' PII.

107. Had Caesars disclosed to Plaintiff and Subclass Members that its data systems were not secure and, thus, vulnerable to attack, Caesars would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Caesars was trusted with sensitive and valuable PII regarding millions of consumers, including Plaintiff and the Subclass. Caesars accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and the Subclass Members acted reasonably in relying on Caesars' misrepresentations and omissions, the truth of which they could not have discovered.

108. As a direct and proximate result of Caesars' violations of California Civil Code § 1770, Plaintiff and California Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Caesars' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

109. Plaintiff, on behalf of herself and the Subclass, demands judgment against Defendant under the CLRA for injunctive relief.

110. Plaintiff, on behalf of herself and the Subclass, further intends to seek compensatory and punitive damages. Pursuant to Cal. Civ. Code § 1782(a), Plaintiff will serve Defendant with notice of its alleged violations of the CLRA by certified mail return receipt requested. If, within thirty days after the date of such notification, Defendant fails to provide appropriate relief for its violations of the CLRA, Plaintiff will amend this Complaint to seek monetary damages.

111.    Notwithstanding any other statements in this Complaint, Plaintiff does not seek monetary damages in conjunction with his CLRA claim—and will not do so—until this thirty-day period has passed.

**Count 5**
**Violation of Illinois Personal Information Protection Act**
**815 Ill. Comp. Stat. § 530/1, *et seq.***
**On behalf of Plaintiff Cherveny and the Illinois Subclass**

112.    Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

113.    As a corporation that handles, collects, disseminates, and otherwise deals with PII, Caesars is a Data Collector as defined in 815 Ill. Comp. Stat. § 530/5.

114.    Plaintiff's and Illinois Subclass Members' PII (*e.g.*, driver's license and Social Security numbers) is PII as covered under 815 Ill. Comp. Stat. § 530/5.

115.    As a Data Collector, Defendant is required to implement and maintain reasonable security measures to protect Plaintiff's and Illinois Subclass Members' PII from unauthorized access, acquisition, destruction, use, modification, or disclosure pursuant to 815 Ill. Comp. Stat. § 530/45.

116.    Caesars violated 815 Ill. Comp. Stat. § 530/45 by failing to maintain reasonable data security procedures to protect Plaintiff's and Illinois Subclass Members' PII.

117.    As a direct and proximate result of Defendant's violations of 815 Ill. Comp. Stat. § 530/45, Plaintiff and Illinois Subclass Members suffered damages including imminent and continued risk of harm of identity theft and fraud, expending time and effort to place freezes or alerts with credit reporting agencies and financial institutions, purchasing identity theft monitoring or protection services, and monitoring and reviewing credit reports and accounts for possible unauthorized activity, among other things.

118.    Plaintiff and Illinois Subclass Members seek relief for the harm they suffered because of Defendant's violations of 815 Ill. Comp. Stat. § 530/45, including actual damages, restitution, equitable relief, punitive damages, and attorneys' fees and costs.

**Count 6**

**Violation of Illinois Consumer Fraud Act**
**815 Ill. Comp. Stat. § 505,** *et seq.*
**On behalf of Plaintiff Cherveny and the Illinois Subclass**

119.    Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

120.    Caesars is a "person" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

121.    Plaintiff and Illinois Subclass Members are "consumers" as defined by 815 Ill. Comp. Stat. §§ 505/1(e).

122.    Caesars' conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

123.    Caesars' deceptive, unfair, and unlawful trade acts or practices, in violation of 815 Ill. Comp. Stat. § 505/2, include:

    a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

    b.    Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a), which was a direct and proximate cause of the Data Breach;

    d.    Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a);

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Subclass Members' PII; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a).

124. Caesars' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Caesars' data security and ability to protect the confidentiality of consumers' PII.

125. Caesars intended to mislead Plaintiff and Illinois Subclass Members and induce them to rely on its misrepresentations and omissions.

126. The above unfair and deceptive practices and acts by Caesars were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

127. Caesars acted intentionally, knowingly, and maliciously to violate Illinois's Consumer Fraud Act, and recklessly disregarded Plaintiff and Illinois Subclass Members' rights.

128. As a direct and proximate result of Caesars' unfair, unlawful, and deceptive acts and practices, Plaintiff and Illinois Subclass Members have suffered and will continue to suffer

injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Caesars' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

129.    Plaintiff and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**Count 7**
**Violation of Illinois Uniform Deceptive Trade Practices Act**
**815 Ill. Comp. Stat. § 510/1, *et seq.***
**On behalf of Plaintiff Cherveny and the Illinois Subclass**

130.    Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

131.    Caesars is a "person" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

132.    Caesars engaged in deceptive trade practices in the conduct of its business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including:

    a.  Representing that goods or services have characteristics that they do not have;

    b.  Representing that goods or services are of a particular standard, quality, or grade if they are of another;

    c.  Advertising goods or services with intent not to sell them as advertised; and

    d.  Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

133.    Caesars' deceptive acts and practices include:

    a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

    b.  Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of

cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a), which was a direct and proximate cause of the Data Breach;

d.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a);

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Subclass Members' PII; and

g.  Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a).

134.   Caesars' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Caesars' data security and ability to protect the confidentiality of consumers' PII.

135.   The above unfair and deceptive practices and acts by Caesars were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Illinois Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

136.   As a direct and proximate result of Caesars' unfair, unlawful, and deceptive trade practices, Plaintiff and Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Caesars' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

137.   Plaintiff and Illinois Subclass Members seek all relief allowed by law, including injunctive relief.

**Count 8**
**Violation of Louisiana Unfair Trade Practices and Consumer Protection Law**
**La. Rev. Stat. Ann. § 51:1401, *et seq*.**
**On behalf of Plaintiff Colflesh and the Louisiana Subclass**

138.   Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

139.   Caesars, Plaintiff, and the Louisiana Subclass Members are "persons" within the meaning of the La. Rev. Stat. Ann. § 51:1402(8).

140.   Plaintiff and Louisiana Subclass Members are "consumers" within the meaning of La. Rev. Stat. Ann. § 51:1402(1).

141.   Caesars engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. Ann. § 51:1402(10).

28

142. The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. Ann. § 51:1405(A). Unfair acts are those that offend established public policy, while deceptive acts are practices that amount to fraud, deceit, or misrepresentation.

143. Caesars engaged in unfair and deceptive acts and practices that violated the La. Rev. Stat. Ann. § 51:1405, including:

    a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

    b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

    d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and Subclass Members' PII, including by implementing and maintaining reasonable security measures;

    e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

    f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Subclass Members' PII; and

    g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and

privacy of Plaintiffs' and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45.

144.    Caesars' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Caesars' data security and ability to protect the confidentiality of consumers' PII.

145.    Caesars intended to mislead Plaintiff and Louisiana Subclass Members and induce them to rely on its misrepresentations and omissions.

146.    Caesars' unfair and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Louisiana Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

147.    Caesars acted intentionally, knowingly, and maliciously to violate Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiffs and Louisiana Subclass Members' rights.

148.    Had Caesars disclosed to Plaintiff and Subclass Members that its data systems were not secure and, thus, vulnerable to attack, Caesars would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Caesars was trusted with sensitive and valuable PII regarding millions of consumers, including Plaintiff and the Subclass. Caesars accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and the Subclass Members acted reasonably in relying on Caesars' misrepresentations and omissions, the truth of which they could not have discovered.

149.    As a direct and proximate result of Caesars' unfair and deceptive acts and practices, Plaintiff and Louisiana Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud

and identity theft; loss of value of their PII; overpayment for Caesars' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

150. Plaintiff and Louisiana Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages; treble damages for Caesars' knowing violations of the Louisiana CPL; declaratory relief; attorneys' fees; and any other relief that is just and proper.

**Count 9**
**Violation of Minnesota Consumer Fraud Act**
**Minn. Stat. § 325F.68,** *et seq.* **and Minn. Stat. § 8.31,** *et seq.*
**On behalf of Plaintiffs William and Cynthia Rubner and the Minnesota Subclass**

151. Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

152. Caesars, Plaintiffs, and members of the Minnesota Subclass are each a "person" as defined by Minn. Stat. § 325F.68(3).

153. Caesars' goods, services, commodities, and intangibles are "merchandise" as defined by Minn. Stat. § 325F.68(2).

154. Caesars engaged in "sales" as defined by Minn. Stat. § 325F.68(4).

155. Caesars engaged in fraud, false pretense, false promise, misrepresentation, misleading statements, and deceptive practices in connection with the sale of merchandise, in violation of Minn. Stat. § 325F.69(1), including:

    a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

    b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' PII, including duties

imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Subclass Members' PII; and

g.  Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45.

156.  Caesars' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Caesars' data security and ability to protect the confidentiality of consumers' PII.

157.  Caesars intended to mislead Plaintiffs and Minnesota Subclass Members and induce them to rely on its misrepresentations and omissions.

158.  Caesars' fraudulent, misleading, and deceptive practices affected the public interest, including the many Minnesotans affected by the Caesars Data Breach.

159.  As a direct and proximate result of Caesars' fraudulent, misleading, and deceptive practices, Plaintiffs and Minnesota Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud

and identity theft; loss of value of their PII; overpayment for Caesars' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

160.     Plaintiffs and Minnesota Subclass Members seek all monetary and non-monetary relief allowed by law, including damages; injunctive or other equitable relief; and attorneys' fees, disbursements, and costs.

**Count 10**
**Violation of Minnesota Uniform Deceptive Trade Practices Act**
**Minn. Stat. § 325D.43, *et seq.***
**On behalf of Plaintiffs William and Cynthia Rubner and the Minnesota Subclass**

161.     Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

162.     By engaging in deceptive trade practices in the course of its business and vocation, directly or indirectly affecting the people of Minnesota, Caesars violated Minn. Stat. § 325D.44, including the following provisions:

    a.  Representing that its goods and services had characteristics, uses, and benefits that they did not have;

    b.  Representing that goods and services are of a particular standard or quality when they are of another;

    c.  Advertising goods and services with intent not to sell them as advertised;

    d.  Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

163.     Caesars' deceptive practices include:

    a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

    b.  Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Subclass Members' PII; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45.

164. Caesars' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Caesars' data security and ability to protect the confidentiality of consumers' PII.

165. Caesars intended to mislead Plaintiffs and Minnesota Subclass Members and induce them to rely on its misrepresentations and omissions.

166. Had Caesars disclosed to Plaintiffs and Subclass Members that its data systems were not secure and, thus, vulnerable to attack, Caesars would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Caesars was trusted with sensitive and valuable PII regarding millions of consumers, including Plaintiffs and the Subclass. Caesars accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly,

Plaintiffs and the Subclass Members acted reasonably in relying on Caesars' misrepresentations and omissions, the truth of which they could not have discovered.

167.     Caesars acted intentionally, knowingly, and maliciously to violate Minnesota's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiffs and Minnesota Subclass Members' rights.

168.     As a direct and proximate result of Caesars' deceptive trade practices, Plaintiffs and Minnesota Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Caesars' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

169.     Plaintiffs and Minnesota Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief and attorneys' fees and costs.

**Count 11**
**Violation of Nevada Consumer Fraud Act**
**Nev. Rev. Stat. § 41.600**
**On behalf of all Plaintiffs and the Nationwide Class**

170.     Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

171.     The Nevada Consumer Fraud Act, Nev. Rev. Stat. § 41.600, may be applied on a nationwide basis because Caesars' unlawful conduct occurred in Nevada.

172.     Caesars is subject to the Nevada Consumer Fraud Act because it is headquartered in and does business in Nevada. The Nevada Consumer Fraud Act states: "1. An action may be brought by any person who is a victim of consumer fraud. 2. As used in this section, 'consumer fraud' means: [...] (e) A deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive."

173.     Nev. Rev. Stat. § 598.0923(1) states: "A person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly: [...] (b)

Fails to disclose a material fact in connection with the sale or lease of goods or services." The Caesars Rewards program provides benefits to its members who purchase Caesars' goods and services. Caesars violated this provision because its U.S. Privacy Policy states that it maintains physical, electronic, and organizational safeguards to protect PII under its control, and Caesars failed to disclose the material fact that its data security practices were inadequate to reasonably safeguard consumers' PII. Caesars knew or should have known that its data security practices were deficient because, among other things, Caesars was aware that the hospitality industry was a frequent target of sophisticated cyberattacks. Caesars could and should have made a proper disclosure during the account creation process for its Caesars Rewards program, as part of the purchase of goods or services by Caesars Rewards members, or by any other means reasonably calculated to inform consumers of its inadequate data security.

174. Nev. Rev. Stat. § 598.0923(1) also states that: "A person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly: […] (c) Violates a state or federal statute or regulation relating to the sale or lease of goods or services." Caesars committed several such violations, each of which serves as an independent act sufficient to constitute a deceptive trade practice.

175. First, Caesars breached a Nevada statue requiring reasonable data security. Specifically, Nev. Rev. Stat. § 603A.210(1), which regulates information security of businesses that collect data "for any purpose," states: "A data collector that maintains records which contain personal information of a resident of this State shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition […] or disclosure." Caesars is a data collector as defined at Nev. Rev. Stat. § 603A.030, and collects data for, among other purposes, marketing and selling Caesars Rewards members its goods and services. Caesars failed to implement and maintain reasonable security measures, evidenced by the fact that hackers accessed Caesars' loyalty program database and stole consumers' PII. Caesars' violation of this statute was done knowingly for purposes of Nev. Rev. Stat. § 598.0923(1) because Caesars knew or should have known that its data security practices were deficient. This is true because, among

other things, Caesars was aware that the hospitality industry is a frequent target of sophisticated cyberattacks. Caesars knew or should have known that its data security practices were insufficient to guard against those attacks. Caesars had knowledge of the facts that constituted the violation.

176. Second, Caesars breached other state statutes regarding unfair trade practices and data security requirements as alleged herein. Specifically, Caesars violated the various state statutes of California, Illinois, Louisiana, and Minnesota set forth in Counts 1-10 above. Caesars knew or should have known that it violated these statutes. Caesars' violations of each of these statutes serves as an independent act sufficient to constitute a deceptive trade practice under Nev. Rev. Stat. § 598.0923(1).

177. Third, Caesars violated the FTC Act, 15 U.S.C. § 45. Caesars knew or should have known that its data security practices were deficient, violated the FTC Act, and that it failed to adhere to the FTC's data security guidance. This is true because, among other things, Caesars was aware that the hospitality industry is a frequent target of sophisticated cyberattacks. Caesars knew or should have known that its data security practices were insufficient to guard against those attacks. Caesars had knowledge of the facts that constituted the violation. Caesars' violation of the FTC Act serves as an independent act sufficient to constitute a deceptive trade practice under Nev. Rev. Stat. § 598.0923(1).

178. Caesars engaged in deceptive or unfair practices by engaging in conduct that is contrary to public policy, unscrupulous, and caused injury to Plaintiffs and Class Members.

179. Nev. Rev. Stat. § 41.600(3) states that if the plaintiffs prevail, the court "shall award […] (a) Any damages that the claimant has sustained; (b) Any equitable relief that the court deems appropriate; and (c) The claimant's costs in the action and reasonable attorney's fees."

180. As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered all forms of damages alleged herein. Plaintiffs' harms constitute compensable damages for purposes of Nev. Rev. Stat. § 41.600(3).

181. Plaintiffs and Class Members are also entitled to all forms of injunctive relief sought herein.

182.     Plaintiffs and Class Members are also entitled to an award of their attorney's fees and costs pursuant to Nev. Rev. Stat. § 41.600(3)(c).

**Count 12**
**Negligence**
**On behalf of all Plaintiffs and the Nationwide Class**

183.     Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

184.     Plaintiffs and Class Members were required to provide their PII, including their names, dates of birth, addresses, telephone numbers, email addresses, and drivers' license and Social Security numbers to Caesars as a condition of joining Caesars Rewards.

185.     Plaintiffs and Class Members entrusted their PII to Caesars with the understanding that Caesars would safeguard their PII.

186.     In its written privacy policies, Caesars expressly promised Plaintiffs and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Caesars Data Breach. In addition, Caesars promised to maintain reasonable and appropriate safeguards to protect Plaintiffs' and Class Members' PII.

187.     Caesars had full knowledge of the sensitivity of the PII that it stored and the types of harm that Plaintiffs and Class Members could and would suffer if that PII were wrongfully disclosed.

188.     Caesars violated its duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining, and testing Caesars' information security controls to ensure that PII in its possession was adequately secured by, for example, encrypting sensitive personal information, installing intrusion detection systems and monitoring mechanisms, and using access controls to limit access to sensitive data.

189.     Caesars' duty of care arose from, among other things,

    a.  Caesars' exclusive ability (and Class Members' inability) to ensure that its systems were sufficient to protect against the foreseeable risk that a data breach could occur;

b. Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures;

c. Caesars' common law duties to adopt reasonable data security measures to protect customer PII and to act as a reasonable and prudent person under the same or similar circumstances would act; and

d. State statutes requiring reasonable data security measures, including Nev. Rev. Stat. § 603A.210, which states that businesses possessing personal information of Nevada residents "shall implement and maintain reasonable security measures to protect those records from unauthorized access."

190. Caesars' violation of the FTC Act and state data security statutes constitutes negligence per se for purposes of establishing the duty and breach elements of Plaintiffs' negligence claim. Those statutes were designed to protect a group to which Plaintiffs belong and to prevent the types of harm that resulted from the Data Breach.

191. Caesars is a multi-billion-dollar publicly traded company that had the financial and personnel resources necessary to prevent the Data Breach. Caesars nevertheless failed to adopt reasonable data security measures, in breach of the duties it owed to Plaintiffs and Class Members.

192. Plaintiffs and Class Members were the foreseeable victims of Caesars' inadequate data security. Caesars knew that a breach of its systems could and would cause harm to Plaintiffs and Class Members.

193. Caesar's conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Caesars' conduct included its failure to adequately restrict access to its loyalty program database that held consumers' PII.

194. Caesars knew or should have known of the inherent risks in collecting and storing massive amounts of PII, the importance of providing adequate data security over that PII, and the frequent cyberattacks within the hospitality industry.

195.     Plaintiffs and Class Members had no ability to protect their PII once it was in Caesars' possession and control. Caesars was in an exclusive position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

196.     Caesars, through its actions and inactions, breached its duty owed to Plaintiffs and Class Members by failing to exercise reasonable care in safeguarding their PII while it was in Caesars' possession and control. Caesars breached its duty by, among other things, its failure to adopt reasonable data security practices and its failure to adequately encrypt the PII in its systems.

197.     Caesars inadequately safeguarded consumers' PII in deviation of standard industry rules, regulations, and best practices at the time of the Data Breach.

198.     But for Caesars' breach of its duty to adequately protect Class Members' PII, Class Members' PII would not have been stolen.

199.     There is a temporal and close causal connection between Caesars' failure to implement adequate data security measures, the Data Breach, and the harms suffered by Plaintiffs and Class Members.

200.     As a result of Caesars' negligence, Plaintiffs and Class Members suffered and will continue to suffer the various types of damages alleged herein.

201.     Plaintiffs and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate identity protection services. Plaintiffs and Class Members are also entitled to the injunctive relief sought herein.

**Count 13**
**Negligent Misrepresentation**
**On behalf of all Plaintiffs and the Nationwide Class**

202.     Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

203.     Nevada has adopted the Restatement (Second) of Torts § 551 (1977), which imposes liability for negligent misrepresentations based on omissions. Section 551, titled "Liability for Nondisclosure," states:

> One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same

liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if […] he is under a duty to the other to exercise reasonable care to disclose the matter in question.

204. Caesars failed to disclose to Plaintiffs and Class Members that it did not employ reasonable measures to protect consumers' PII.

205. Caesars knew or should have known that its data security practices were deficient. This is true because, among other things, Caesars was aware that the hospitality industry is a frequent target of sophisticated cyberattacks.

206. Caesars' omissions were material given the sensitivity of the PII maintained by Caesars and the gravity of the harm that could result from theft of the PII.

207. Caesars knew that consumers would create Caesars Rewards accounts under a mistake as to facts basic to the transactions. Because of the relationship between the parties, consumers would reasonably expect a disclosure of Caesars' inadequate data security.

208. Had Caesars disclosed its inadequate data security to Plaintiffs and Class Members, Plaintiffs and Class Members would not have entrusted their PII to Caesars.

209. Caesars should have made a proper disclosure to consumers during the Caesars Rewards account creation process, as part of the purchase of goods or services by Caesars Rewards members, or by any other means reasonably calculated to inform consumers of its inadequate data security.

210. In addition to its omissions, Caesars is also liable for its implied misrepresentations. Caesars required consumers to provide their PII during the Caesars Rewards account creation process. In doing so, Caesars made implied or implicit representations that it employed reasonable data security practices to protect consumers' PII. By virtue of accepting Plaintiffs' and Class Members' PII during the Caesars Rewards account creation process, Caesars implicitly represented that its data security processes were sufficient to reasonably safeguard the PII. This constituted a negligent misrepresentation.

211. Caesars failed to exercise reasonable care or competence in communicating its omissions and misrepresentations.

212.     As a direct and proximate result of Caesars' omissions and misrepresentations, Plaintiffs and Class Members suffered the various types of damages alleged herein.

213.     Plaintiffs and Class Members are entitled to all forms of monetary compensation and injunctive relief set forth herein.

**Count 14**
**Unjust Enrichment**
**On behalf of all Plaintiffs and the Nationwide Class**

214.     Plaintiffs incorporate by reference and reallege each and every allegation above as though fully set forth herein.

215.     Plaintiffs and Class Members conferred a monetary benefit upon Caesars. Specifically, they provided their PII to Caesars, which Caesars used for marketing and other revenue-generating purposes. Caesars used its rewards program to incentivize Class Members to spend money on hotel stays, gambling, dining, entertainment, and other services at Caesars properties.

216.     In exchange for providing PII to Caesars, Plaintiffs and Class Members should have received their Caesars Rewards membership and associated benefits accompanied by adequate safeguarding of their PII.

217.     Under principles of equity and good conscience, Caesars should not be permitted to retain the full monetary benefit of its transactions with Plaintiffs and Class Members, because Caesars failed to adequately secure consumers' PII and, therefore, did not provide the full services that consumers transacted for.

218.     Caesars acquired consumers' PII through inequitable means in that it failed to disclose its inadequate data security practices when entering into transactions with consumers and obtaining their PII.

219.     If Plaintiffs and Class Members would have known that Caesars employed inadequate data security safeguards, they would not have agreed to transact with Caesars.

220.     Plaintiffs and Class Members have no adequate remedy at law. Caesars continues to retain Class Members' PII while exposing the PII to a risk of future data breaches while in

Caesars' possession. Caesars also continues to derive a financial benefit from using Class Members' PII.

221. As a direct and proximate result of Caesars' conduct, Plaintiffs and Class Members have suffered the various types of damages alleged herein.

222. Caesars should be compelled to disgorge into a common fund or constructive trust, for the benefit of Class Members, the proceeds that they unjustly derived from use of Class Members' PII.

### Count 15
### Breach of Implied Contract
### On behalf of all Plaintiffs and the Nationwide Class

223. Plaintiffs repeat and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

224. Plaintiffs and Class Members entered into an implied contract with Caesars when they obtained products or services from Caesars, joined the loyalty program, or otherwise provided PII to Caesars.

225. As part of these transactions, Caesars agreed to safeguard and protect the PII of Plaintiffs and Class Members and to timely and accurately notify them if their PII was breached or compromised.

226. Plaintiffs and Class Members entered into the implied contracts with the reasonable expectation that Caesars's data security practices and policies were reasonable and consistent with legal requirements and industry standards. Plaintiffs and Class Members believed that Caesars would use part of the monies paid to Caesars under the implied contracts or the monies obtained from the benefits derived from the PII they provided to fund proper and reasonable data security practices.

227. Plaintiffs and Class Members would not have provided and entrusted their PII to Caesars or would have paid less for Caesars products or services in the absence of the implied contract or implied terms between them and Caesars. The safeguarding of the PII of Plaintiffs and Class Members was critical to realize the intent of the parties.

228. Plaintiffs and Class members fully performed their obligations under the implied contracts with Caesars.

229. Caesars breached its implied contracts with Plaintiffs and Class Members to protect their PII when it (1) failed to take reasonable steps to use safe and secure systems to protect that information; and (2) disclosed that information to unauthorized third parties.

230. As a direct and proximate result of Caesars's breach of implied contract, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Caesars's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class set forth herein, respectfully request the following relief:

A. That the Court certify this action as a class action and appoint Plaintiffs and their counsel to represent the Class;

B. That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein and directing

Defendant to adequately safeguard the PII of Plaintiffs and the Class by implementing improved security controls;

C. That the Court award compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

D. That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

E. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of Defendant's unlawful acts, omissions, and practices;

F. That the Court award to Plaintiffs and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

G. That the Court award pre- and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all claims so triable.


Dated: November 6, 2023

       */s/ Martin A. Muckleroy*
**MUCKLEROY LUNT, LLC**
MARTIN A. MUCKLEROY
Nevada Bar No.: 009634
6077 S. Fort Apache Rd., Ste. 140
Las Vegas, NV 89148
Phone: (702) 907-0097
Fax: (702) 938-4065
martin@muckleroylunt.com

**SCHUBERT JONCKHEER & KOLBE LLP**
ROBERT C. SCHUBERT (rschubert@sjk.law)
WILLEM F. JONCKHEER (wjonckheer@sjk.law)
AMBER L. SCHUBERT (aschubert@sjk.law)
2001 Union St, Ste 200
San Francisco, CA 94123

Tel: (415) 788-4220
Fax: (415) 788-0161

*Attorneys for Plaintiffs and the Proposed Classes*